IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SETH D. HARRIS,[1] Acting Secretary of Labor, )
United States Department of Labor, )
　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　Plaintiff, ) No. 10 C 4467
　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　v. ) Judge Dow
　　　　　　　　　　　　　　　　　　　　　 )
DISTRICT LODGE NO. 141, INTERNATIONAL )
ASSOCIATION OF MACHINISTS AND )
AEROSPACE WORKERS, )
　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　Defendant. )

## CERTIFICATION OF ELECTION

　　　The election having been conducted in the above matter under the supervision of the

Secretary of Labor, United States Department of Labor, pursuant to a Stipulation of Settlement

and Order issued August 1, 2011, in the United States District Court for the Northern District of

Illinois, Eastern Division, in accordance with the provisions of Title IV of the Labor-

Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 481 et seq.) and in conformity

with the Bylaws of the defendant labor organization, insofar as lawful and practicable, therefore:

　　　Pursuant to Section 402(c) of the Labor-Management Reporting and Disclosure Act of

1959 (29 U.S.C. § 482 (c)), and the authority delegated to me,

　　　IT IS HEREBY CERTIFIED that the following named candidate has been duly elected to

the office designated:

---

[1] This action was originally brought by Hilda L. Solis, former Secretary of Labor, designated Acting Secretary of Labor Seth D. Harris, is automatically substituted as party in accordance with Rule 25(d), Federal Rules of Civil Procedure.

| | |
|---|---|
| President/Directing General Chairman | Richard Delaney |
| Secretary-Treasurer | Dave Atkinson |
| Vice President-East | Brad Burson |
| Vice President-at-Large | Troy Rivera |
| Vice President-Hawaii | Shannon Robello |
| Trustee | Greg Brown |
| Trustee | Mark Baskett |
| Assistant General Chair | Laura Stone |
| Assistant General Chair | Michael Klemm |
| Assistant General Chair | Kris Hannah |
| Assistant General Chair | Erik Stenberg |
| Assistant General Chair | Frank O'Donnell |
| Assistant General Chair | Bob Worthman |
| Assistant General Chair | Shawn Humpherys |
| Assistant General Chair | Nick Handlow |
| Assistant General Chair | Michael Maiorino |
| Assistant General Chair | Ray Wallis |
| Assistant General Chair | Alexander Gerulis |
| Assistant General Chair | Pat Rezler |
| Assistant General Chair | Mike Quartuccio |
| Assistant General Chair | Richard Chu |
| Assistant General Chair | Sandra Olmos |
| Assistant General Chair | Joseph Bartz |

| Assistant General Chair | Danny Lebron |
| Assistant General Chair | Rose BradyCohen |
| Assistant General Chair | Mike Fairbanks |
| Assistant General Chair | Arthur Croker |
| Assistant General Chair | John Medeiros |

Attached herewith is a declaration setting forth the protests concerning violations which were alleged to have occurred in the conduct of the election and the findings of the investigation of these protests.

Signed this 26th day of March, 2013.

*Patricia Fox*

Patricia Fox
Chief, Division of Enforcement
Office of Labor-Management Standards
U. S. Department of Labor
Washington, D.C. 20210

# ATTACHMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SETH D. HARRIS, Acting Secretary of Labor,    )
United States Department of Labor,            )
                                              )
                    Plaintiff,                )       No. 10 C 4467
                                              )
          v.                                  )       Judge Dow
                                              )
DISTRICT LODGE NO. 141, INTERNATIONAL )
ASSOCIATION OF MACHINISTS AND                 )
AEROSPACE WORKERS,                            )
                                              )
                    Defendant.                )

## DECLARATION OF PATRICIA FOX

I, Patricia Fox, am the Chief, Division of Enforcement, Office of Labor Management

Standards (OLMS), U.S. Department of Labor (Department). Pursuant to a Stipulation of

Settlement and Order filed on August 1, 2011, in the U.S. District Court for the Northern District

of Illinois, Eastern Division, the Department supervised all aspects of the International

Association of Machinists and Aerospace Workers (IAM) District Lodge 141 (DL 141)

nominations and June 2012 regularly scheduled election for President/Directing General

Chairman, Secretary-Treasurer, Vice-President East, Vice-President Hawaiian Area, Vice-

President At-Large, two (2) Trustees, and eleven (11) Assistant General Chairpersons. Pursuant

to the Order, the Department also supervised new nominations and the election of ten (10)

Assistant General Chairpersons who will serve the remainder of a four-year term that

commenced at the DL 141 Convention held in October 2010. Each of the 47 local lodges

affiliated with DL 141 could nominate one candidate for each officer position. If, at the

nominations meeting, members of a local lodge nominated more than one candidate for a

particular office, an election was held at the meeting to determine the official nominee of the local lodge. The supervised local lodge nomination meetings were held throughout the month of March 2012. Local lodge polling site elections were held throughout the month of June 2012, and the individual local lodge election results were verified from July 9, 2012 through July 13, 2012.

The Department received five pre-election protests and two post-election protests. A pre-election protest was received from David Smith on February 27, 2012; three pre-election protests were received from Tim Nelson on April 23, 2012, May 7, 2012, and May 15, 2012; and a pre-election protest was received from Tony Gibson on May 21, 2012. A post-election protest was received from William Gray on July 17, 2012, and a post-election protest containing multiple allegations was received from Tim Nelson on July 20, 2012. No other protests were filed with the Election Supervisor. Pursuant to section 601 of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 521, the Department conducted an investigation to determine whether any violations of the LMRDA occurred. Each of the protested allegations is set forth below with an explanation for its dismissal.

A. Pre-Election Protests

David Smith's February 27, 2012 Pre-Election Protest

Allegation: David Smith, a member of Local Lodge 1776, alleged that many members of the local were scheduled to work on the day and at the time set for the Local 1776 nomination/ election meeting and were denied the opportunity to participate in the process.

Response: Section 401(e) of the LMRDA, 29 U.S.C. § 481(e), provides that in any election subject to the provisions of Title IV, a reasonable opportunity must be afforded for the nomination of candidates. 29 U.S.C. § 481(e); 29 C.F.R. § 452.55. The investigation of the

2

protest found that DL 141's nominating procedure did not afford members a reasonable opportunity to nominate candidates as required by section 401(e) of the LMRDA. The investigation confirmed that members had to be present at the meeting to both nominate and vote. However, a significant number of Local Lodge 1776 members were required to work at the time of the scheduled nomination meeting.

To remedy this violation, the Department instructed DL 141 to modify its nominations process for the June 2012 supervised election. On April 3, 2012, the Department negotiated an agreement with DL 141 that any member whose name was placed in nomination for a district lodge officer position in four or more local lodges would be considered a nominee for that position. As a result of this modification of the nomination endorsement procedures in the DL 141 Bylaws, member Patricia Gutierrez, who was nominated for assistant general chairperson in at least four local lodges but failed to obtain four local lodge endorsements, was nonetheless listed as a candidate on the DL 141 officer ballot. The placement of Gutierrez on the DL 141 officer ballot remedied any potential violation of the nomination process that was raised by Smith's protest.

In an effort to effectuate a lasting remedy so as to avoid future Title IV violations involving the nominations process, the Department directed the DL 141 to submit a resolution at its October 2012 Convention to amend Article VIII, Section 6 of the DL 141 Bylaws so that the DL 141 nomination procedures fully comply with section 401(e) of the LMRDA. During the IAM's October 2012 Convention, DL 141 submitted such a resolution to amend Article VIII, Section 6 of the DL 141's Bylaws. The convention delegates adopted the resolution unanimously. In accordance with the DL 141 Bylaws, the proposed amendment must be

3

presented to the DL 141 membership for ratification at local lodge meetings before being submitted to the International President for approval.

<u>Tim Nelson's April 23, 2012 Pre-Election Protest</u>

Allegation: Tim Nelson, a member of Local Lodge 1487, protested the requirement of a two-year membership in good standing requirement to run as a candidate for office. He requested that the two-year continuous good standing eligibility requirement be waived for two members, Mitch Buckley and Bruce Davis, who were nominated for the office of assistant general chairperson on his "Occupy 141" slate.

Response: Article VIII, Section 3 of the DL 141 Bylaws states that candidates for assistant general chairmen must have been in continuous good standing for at least two years. Under the LMRDA, it would ordinarily be reasonable for a local union to require a candidate to have been a member of the organization for a reasonable period of time, not exceeding two years, before the election as well as a requirement of continuous good standing based on punctual payment of dues. 29 C.F.R. § 452.37(a). The DL 141's two-year good standing requirement is not unreasonable and is not an unlawful candidate eligibility requirement. There was no violation of the LMRDA.

Allegation: Nelson protested the manner in which names were placed on the ballot.

Response: The LMRDA does not prescribe the form of the ballot used in any election. 29 C.F.R. § 452.112. Article VIII, Section 7(a) of the DL 141 Bylaws provides that . . . the District Secretary-Treasurer shall, not later than May 1, prepare the ballot and have printed thereon the names of all eligible candidates . . . in order according to the number of endorsements received by each candidate for each office stated. The Department found that DL

4

141 complied with the practice prescribed in the DL 141 Bylaws. There was no violation of the LMRDA.

Tim Nelson's May 7, 2012 Pre-Election Protest

Allegation: Nelson protested that the DL 141 officer ballot had not been prepared by the May 1 deadline as required by Article VIII, Section 7(a) of the DL 141 Bylaws (referenced in the immediately preceding response). Nelson also alleged that Article VIII, Section 6(g) of the DL 141's Bylaws was violated when the DL 141 secretary-treasurer failed to immediately notify all nominees that their names would appear on the ballot. Nelson asserted that the immediate notification should have occurred on or around the April 25, 2012 deadline date for nominees to accept their nomination.

Response: Section 401(e) of the LMRDA provides that an election subject to the provisions of Title IV shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of Title IV. 29 U.S.C. § 481(e). The investigation found that the election ballots were printed on May 10, 2012, and samples were distributed to candidates on that day. The ballots were distributed to local lodges on May 16, 2012. While the investigation found that the ballots were not printed by the May 1st deadline as required by Article VIII, Section 7(a) of the DL 141 Bylaws, there is no indication that this delay may have affected the outcome of the election as required by 29 U.S.C. § 402(c)(2). Further, all nominees knew that their names would appear on the ballot before the first polling site election was held on June 5, 2012.

Allegation: Nelson objected to campaign statements that Joe Bartz, DL 141 Assistant General Chairman, posted on the *IAM Voting IAM* Facebook group page.

5

Response: The LMRDA does not and unions may not regulate the contents of campaign literature. 29 C.F.R. § 452.70. The investigation found that Nelson established the *IAM Voting IAM* Facebook group page as a forum for members to discuss the DL 141 officer election. A union may not censor the statements of candidates in any way, even though the statements may include derogatory remarks about other candidates. Id. The investigation did not reveal any evidence that union resources were used to establish or administer the *IAM Voting IAM* Facebook group page. There was no violation of the LMRDA.

Allegation: Nelson alleged that Dave Atkinson, DL 141 Secretary-Treasurer, threatened him when he posted "Tim Stop attacking the hard working people of District 141, it is your last warning!" on Facebook on May 7, 2012.

Response: Under Section 610 of the LMRDA, it shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this Act. 29 U.S.C. § 530. The Department reviewed the posted statement made by Atkinson and concluded that because the language did not rise to the level of threatening physical harm or violence, there was no violation of Section 610 of the LMRDA. In addition, the Department did not consider this language to be reprisal or improper interference of Nelson's right to support the candidates of his choice. Nelson participated in the election process despite the language. There was no violation of the LMRDA.

Allegation: Nelson alleged that on May 5, 2012, DL 141 President & Directing General Chairman Rich Delaney and other officers used union time and resources to campaign when they traveled to Newark Airport and Delaney gave a negotiations update to members there. He

6

further asserted that Delaney's visit to Newark Airport was not normal and was a "front" to campaign.

Response: Section 401(g) of the LMRDA prohibits the use of union funds or resources to promote the candidacy of any person in an election subject to the provisions of Title IV. 29 U.S.C. § 481(g); 29 C.F.R. § 452.73. Under the LMRDA, officers and employees may not campaign on time that is paid for by the union, nor use union funds, facilities, equipment, stationery, etc. to assist them in such campaigning. Campaigning incidental to regular union business would not be a violation of the LMRDA. 29 C.F.R. § 452.76. The investigation established that Delaney and the other officers visited Newark Airport on May 5, 2012 to conduct official union business related to contract negotiations. There was no evidence that Delaney or any other officers engaged in campaigning at Newark Airport on May 5, 2012, that could not be considered incidental to union business. There was no violation of the LMRDA.

Allegation: Nelson alleged that DL 141 executive board members discussed "141 Rising" campaign strategy at a May 5, 2012 (typo by Nelson, the correct date is May 4, 2012) executive board meeting.

Response: Inasmuch as this allegation is included in Nelson's post-election protest, the investigative findings related to this issue are discussed in detail below in response to allegation 2 of his post-election protests.

Allegation: Nelson alleged that Bartz campaigned on Facebook on May 5, 2012 (typo by Nelson, the correct date is May 4, 2012), while on union time and through the use of union resources such as the DL 141 office in Elk Grove Village, Illinois and a DL 141 computer.

Response:  Inasmuch as this allegation was also included in Nelson's post–election protest, the investigative findings related to this allegation are discussed in detail below in response to allegation 3 of his post-election protests.

Tim Nelson's May 15, 2012 Pre-Election Protest

Allegation:  Tim Nelson protested that DL 141 violated the absentee ballot rules and procedures in the IAM Constitution because the union failed to provide absentee ballots to local lodges in sufficient time for the local lodge recording secretaries to adhere to the absentee ballot timeframes and procedures.  Nelson further contends that because of this oversight, local lodge recording secretaries could not immediately furnish absentee ballots after the legal "request for an absentee ballot" was received from qualified members, as required by Article VIII, Section 9 (b) of DL 141 Bylaws.

Response:  Section 401(e) of the LMRDA provides that an election subject to Title IV shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of Title IV.  29 U.S.C. § 481(e).  Pursuant to Article VIII, Section 7(a) of the DL 141 Bylaws, ballots were to be prepared not later than May 1, 2012. Also, Article VIII, Section 9(a) of the DL 141 Bylaws provides that . . . an absentee ballot request [form] will be included [with the election notice].  Members who reside in outlying districts more than twenty-five (25) miles from the designated balloting place, members who are either confined because of verified illness or on vacation or on official IAM business approved by the Local Lodge, District Lodge or Grand Lodge, . . . shall be furnished absentee ballots, providing that all requests for mail ballots much be made singly, in writing, by the requesting member and delivering in person or mailing such requests, not later than thirty (30) days before the election, to the Local Lodge Recording Secretary, stating the reason for requesting a mail

8

ballot. Article VIII, Section 9(b) of DL 141 Bylaws provides that "the Local Lodge Recording Secretary will, immediately after he ascertains the request to be legal, mail to the requesting member a ballot together with the proper envelope and instructions for voting. These will be provided by the District Secretary-Treasurer."

The investigation established that April 25, 2012, was the deadline for nominees to accept their nominations for DL 141 office. The investigation found that DL 141 did not meet the May 1, 2012 deadline for preparing the officer ballots. In failing to prepare the ballots by May 1, 2012, DL 141 violated Article 7(a) of the DL 141 Bylaws, which was a violation of section 401(e) of the LMRDA. On May 16, 2012, DL 141 mailed the officer ballots to 46 of its 47 affiliated local lodges by Federal Express delivery. The remaining local lodge, Local Lodge 1487, in Des Plaines, Illinois, picked up its supply of ballots from DL 141. Thus, May 17 was the first date that the local lodge recording secretaries could mail absentee ballots to requesting members. There was evidence that local lodge recording secretaries, upon receipt of their local lodge's supply of absentee ballots on or around May 17, mailed those members who submitted absentee ballot requests their absentee ballots. However, to remedy the delay in local lodges receiving their supplies of absentee ballots, which resulted from DL 141's failure to prepare the ballots by May 1, 2012, the Department directed DL 141 to extend the time period by which members could submit absentee ballot requests. DL 141 informed its members by notice dated May 22, 2012, that the deadline for requesting absentee ballots had been extended and that "the absentee ballot request forms must be received by the local lodge no later than seven (7) days before the Local Lodge's June 2012 polling date." The investigation did not reveal any evidence that members eligible to vote by absentee ballot were not afforded sufficient time to do so.

9

Tony Gibson's May 21, 2012 Pre-Election Protest

Allegation: Tony Gibson alleged that members working at the time of the local lodge nomination meetings did not have a reasonable opportunity to participate in the DL 141 officer nomination process.

Response: The investigation of Local Lodge 1776 member David Smith's Pre-Election Protest revealed that DL 141's nominating procedure did not afford members a reasonable opportunity to nominate candidates as required by section 401(e) of the LMRDA, 29 U.S.C. § 481(e). On April 3, 2012, the Department negotiated an agreement with DL 141 that any member whose name was placed in nomination for a district lodge officer position in four or more local lodges would be considered a nominee for that position. As discussed above, in response to the protest filed by Smith (*see* Smith's Pre-Election Protest), the placement of Gutierrez on the DL 141 officer ballot remedied any potential violation of the nomination process that was raised by Gibson's protest.

Allegation: Gibson alleged that DL 141's notice of nomination contained inaccurate absentee ballot request information for Local Lodge 141.

Response: The Department's investigation found that the DL 141 notice of nominations misidentified Local Lodge 141's recording secretary and included an erroneous zip code in Local Lodge 141's mailing address. These errors were remedied on or about February 29, 2012, when a special notice was posted at all Local Lodge 141 work sites to correct the errors in the recording secretary's name and the local lodge's mailing address that were in the original notice of DL 141 nominations.

10

Allegation: Gibson alleged that members of Local Lodge 561, Kansas City, Missouri, may have been denied the right to vote in the June election because the election polling hours covered their entire work shift.

Response: Section 401(e) of the LMRDA, 29 U.S.C. § 481(e), provides that in any election subject to the provisions of Title IV, every member in good standing shall have a reasonable opportunity to vote. 29 U.S.C. § 481(e); 29 C.F.R. § 452.94. The investigation of the protest found that Local Lodge 561's polling hours did not afford members a reasonable opportunity to vote as required by section 401(e) of the LMRDA. To remedy this violation, the Department required Local Lodge 561 to extend the polling hours to allow all members an opportunity to vote on June 28, 2012, regardless of their work shift. The Department required Local Lodge 561 to notify members of the extended polling hours by posting a revised official notice regarding changes to the polling hours. The investigation did not reveal any evidence that members eligible to vote were not afforded sufficient time to do so.

Allegation: Gibson alleged that the nomination notice did not provide members with the proper procedure for returning an absentee ballot request form to the local lodges.

Response: Under the LMRDA, if absentee ballots are necessary, the union must give its members reasonable notice of the availability of such ballots. 29 C.F.R. § 452.95. Article VIII, Section 9(a) of DL 141's Bylaws provides that the election notice shall include an absentee ballot request form, specific information as to who is eligible to receive an absentee ballot, and instructions that members must deliver the absentee ballot request in person or mail such ballot request no later than 30 days before the election. The investigation established that the requirements of Article VIII, Section 9(a) were met because the election notice included a

11

request form for an absentee ballot and the proper procedures for submitting the request form. There was no violation of the LMRDA.

Allegation: Gibson alleged that the absentee ballot rules and procedures established within the IAMAW Official Circular 787 and the IAM Constitution with respect to absentee balloting are unreasonable because the rules require absentee ballot requests to be mailed by U.S. mail or delivered in person within 30 days in advance of the election. Gibson made a general argument that fewer restrictions on the absentee ballot process would be more democratic.

Response: Under the LMRDA, if a union knows in advance that absentee ballots are necessary, the local organization must give its members reasonable notice of the availability of such ballots. 29 C.F.R. § 452.95. The investigation established that IAMAW Circular 787 contains the rules and procedures for requesting an absentee ballot. Members were informed of the availability of absentee ballots in the winter and spring editions of the DL 141 Messenger newsletter. An absentee ballot request form was provided in both editions. Under the procedures of Circular 787, a request for absentee ballot must be delivered by the requester either in person or by official government mail to the recording secretary of the local lodge or the secretary-treasurer of the district lodge not later than thirty (30) days prior to the election. As discussed above in Nelson's May 15, 2012 pre-election protest, DL 141 extended the deadline for requesting absentee ballots. By notice dated May 22, 2012, members were informed that absentee ballot request forms had to be received by the local lodge no later than seven (7) days before the Local Lodges' June 2012 polling date, rather than 30 days prior to the election. Thus, members eligible to vote by absentee ballot were afforded additional time to submit their absentee ballot requests. There was no violation of the LMRDA.

Allegation: Gibson requested that, for the purpose of exercising his observer rights, the DL 141 should provide him with the date, time, and location that each subordinate lodge would be preparing and mailing absentee ballot packages to members.

Response: Section 401(c) of the LMRDA provides that adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots. 29 U.S.C. § 481(c). This provision has been interpreted to give each candidate the right, upon request, to have an observer present at the preparation and mailing of all ballots. 29 C.F.R. § 452.95. The investigation established that the Election Supervisor and his team of investigators interviewed the officers of each of the 47 local lodges prior to the election. An interview questionnaire was completed when they met with these officers. The questionnaire asked the officers of each local lodge how each local lodge handles absentee ballot requests and the right of candidates to have an observer at the preparation and mailing of the absentee ballots. The investigation revealed that each local lodge handled the preparation and mailing of absentee ballots for the members in its local lodge. A review of a sample of the questionnaire responses submitted by each of the 47 local lodges reveals that observers were welcome to watch the preparation and mailing process. As a candidate in the election, Gibson had the right to observe this process. The investigation, however, did not reveal any evidence that Gibson or any other candidate or slate made a request to observe the preparation and mailing of the absentee ballots, or that any request was denied. There was no violation of the LMRDA.

Allegation: Gibson also raised a general allegation that DL 141 officers campaigned on union-paid time.

13

Response:  The Department was unable to investigate this allegation because Gibson did not respond to the Department's efforts to contact him to obtain details concerning this issue.

### B.  Post-Election Protests

William Gray's July 17, 2012 Post-Election Protest

Allegation:  William Gray alleged that DL 141 failed to mail notices of nomination and election to him and other retired members of Local Lodge 2508.  Gray named retired members Archie Roberts, Ray Vecchiarelli and Ernie Vosges as others who did not receive a nomination or election notice.

Response:  Under Section 401(e) of the LMRDA, an election notice must be mailed to each member not less than 15 days prior to the election.  29 U.S.C. § 481(e); 29 C.F.R. § 452.99. The investigation revealed that the notice of nominations for the DL 141 officer election was included in the winter 2012 *Messenger* newsletter, and the notice of election was included in the spring 2012 *Messenger* newsletter.  The Department's review of the mailing address list that DL 141 used to mail the newsletters revealed that Gray's name and address were not on the list.  The IAM membership database, known as VLM, however, listed Gray as a retired member of Local Lodge 2508 with his current mailing address.  The Department's analysis and comparison of the DL 141 mailing address list with the VLM database listing of Local Lodge 2508 members revealed that as many as 71[1] members of Local Lodge 2508 may not have been mailed a notice of nomination or a notice of the DL 141 election even though they should have been included in those mailings.  The investigation confirmed that none of the named retirees received notice of nominations and election for the DL 141 officer election.

---

[1] This 71 member figure includes 28 members of Local Lodge 2508 that neither the DL 141 nor the local lodge could determine were affiliated with District Lodge 141.

14

When interviewed, Gray was unable to provide the name of any member he would have nominated whose name had not already been placed into nomination at a local lodge nomination meeting. Vecchiarelli stated that even if he had received notice of nominations and election, he would not have attended the nominations meeting. Vosges did not state that he would have nominated a member for office, but he did vote at the Local Lodge 2508 union hall on June 5, 2012. In addition, three other retired Local Lodge 2508 members who were not mailed notices were aware of the election as evidenced by their voting in the DL 141 officer election. While the investigation substantiated Gray's allegation that DL 141 failed to mail notices of nomination and election to as many as 71 retired members of Local Lodge 2508, the violation could not have affected the election outcome because the smallest vote margin in the DL 141 officer election was 286 votes for the position of assistant general chairperson and there was no evidence that those who did not receive notice wanted to make a nomination.

Tim Nelson's July 20, 2012 Post- Election Protest

Tim Nelson filed a post-election protest containing multiple allegations. The Department's investigation revealed that 13 of Nelson's allegations raised Title IV issues. Those allegations were investigated and the findings are detailed below. Each of the 13 Title IV issues will be addressed seriatim as each appears in the protest.

Allegation 1: Nelson alleged that the "141 Rising" slate used union resources when it used the DL 141 office in Elk Grove Village, Illinois, as a "shipping point" for the slate's campaign literature. He further alleged that DL 141 employee Barbara Demes received the incumbents' campaign literature, paid for it with her credit card, and then separated and re-mailed the campaign literature to key "141 Rising" supporters for distribution to members.

15

Response: Section 401(g) of the LMRDA prohibits the use of union monies to promote the candidacy of any person in an election subject to Title IV. 29 U.S.C. § 481(g); 29 C.F.R. § 452.73. The Department's investigation revealed that the printer, Bell Litho Inc., delivered "141 Rising" campaign literature to the DL 141 office in Elk Grove Village, Illinois. DL 141, however, did not incur any costs serving as the point of destination for the "141 Rising" slate campaign literature. The Department's investigation did not reveal that "141 Rising" literature was displayed at or disseminated from the office. An examination of the Bell Litho, Inc. invoices and payment records determined that checks drawn on the account of Atkinson, DL 141 Secretary-Treasurer, was used to pay for the printing of "141 Rising" slate's campaign literature. The investigation further revealed that Demes signed for deliveries from Bell Litho, Inc., but denied handling or shipping campaign literature to the incumbents' supporters. Moreover, the investigation found no evidence that Atkinson or anyone else directed Demes to handle or re-mail campaign literature. There was no violation of the LMRDA.

Allegation 2: Nelson alleged that the DL 141 office in Elk Grove Village, Illinois, was used for a "141 Rising" slate campaign meeting on May 4, 2012, the same date as a DL 141 executive board meeting.

Response: Section 401(g) of the LMRDA prohibits the use of union monies to promote the candidacy of any person in an election subject to Title IV. 29 U.S.C. § 481(g); 29 C.F.R. § 452.73. The Department's examination of the May 4, 2012 minutes of the DL 141 executive board meeting did not reveal any partisan campaign statements. The investigation established that DL 141 Trustee John Nielson, in a May 6, 2012 email to Nelson, stated that the launch of the "141 Rising" website was discussed during the May 4, 2012 executive board meeting. The investigation revealed that subsequent to the executive board meeting, Trustee Nielson wrote

16

Nelson an email on May 11, 2012, clarifying that the "141 Rising" campaign and website were not discussed during the executive board meeting. When interviewed, Nielson explained that his May 6, 2012 email was not entirely accurate. Nielson acknowledged that he was trying to get Nelson "riled up" and, in fact, there was no official "141 Rising" campaign meeting held on May 4, 2012. According to Trustee Nielson, some attendees engaged in campaign discussions in the hallway of the DL 141 office after the executive board meeting was over. There was no violation of the LMRDA.

Allegation 3: Nelson alleged that on May 4, 2012, DL 141 officer Bartz campaigned while on union time and from a union owned computer when he posted a statement critical of Nelson on Facebook. Nelson cited a 10:04 a.m. posting to the *IAM Voting IAM* Facebook group page that criticized him as evidence that Bartz campaigned on union time from a union computer.

Response: Section 401(g) of the LMRDA prohibits the use of union monies to promote the candidacy of any person in an election subject to Title IV. 29 U.S.C. § 401(g); 29 C.F.R. § 452.73. The Department's investigation did not reveal any evidence that Bartz was in DL 141's Elk Grove office when he made the post on Facebook. Bartz acknowledged that he made the campaign posting on Facebook while at home and that he did not use a union-issued cellular device or computer. The investigation established that Bartz was listed as one of the attendees at the 11:00 a.m. executive board meeting in Elk Grove, Illinois. Further, the investigation found that Bartz's residence is approximately 30 miles from Elk Grove which would have allowed him sufficient time to travel from his home to DL 141's Elk Grove office. There was not sufficient evidence to conclude that Bartz made the posting while on union time at the Elk Grove office or

17

improperly used union resources to campaign via Facebook. There was no violation of the LMRDA.

Allegation 4: Nelson alleged that there was "an incredible spike in travel" by DL 141 officers between May and June 2012, and that they campaigned while working on union-paid time.[2] In particular, Nelson alleged that Erik Stenberg, Assistant General Chairperson and DL 141 Safety Director, visited Newark Airport to campaign even though he had no union-business reason for such trip.

Response: Under the LMRDA, officers and employees may not campaign on time that is paid for by the union, nor use union funds, facilities, equipment, stationery, etc. to assist them in such campaigning. Campaigning incidental to regular union business would not be a violation of the LMRDA. 29 C.F.R. § 452.76. The investigation established that Stenberg traveled to Newark Airport to attend an arbitration hearing in early 2012, but he could not recall if the hearing was held in March or April 2012. Stenberg acknowledged that he travelled again to Newark Airport in May 2012 when he was accompanied by President Delaney. A review of Stenberg's union travel reports confirms that Stenberg visited Newark Airport on Saturday, May 5, 2012, to conduct a station visit to discuss safety issues. The investigation established that during the May 2012 visit, Delaney spoke to members about safety issues and negotiations with United Airlines. The investigation revealed that Stenberg denied campaigning for the "141 Rising" slate or distributing any campaign literature in May 2012 while at Newark Airport. The investigation also revealed that a Nelson witness confirmed that she was present in Newark Airport's Terminal A break room for United Airlines employees when she observed Stenberg and Delaney campaign to approximately six or seven members prior to the contract negotiations

---

[2] In his May 7, 2012 pre-election protest, Mr. Nelson first alleged district officers improperly campaigned using union resources at Newark Airport on May 5, 2012. *See*, herein, a discussion of the investigative findings of Nelson's May 7, 2012 protest.

update. She could not, however, remember the exact date that she observed this campaigning. The investigation did not reveal any evidence that these officers engaged in campaigning at Newark Airport that could not be considered incidental to union business. There was no violation of the LMRDA.

Allegation: Nelson alleged that on June 2 or 3, 2012, Stenberg campaigned with Delaney at O'Hare Airport when Delaney gave a negotiations update while Stenberg placed campaign literature on a table.

Response: The investigation established that Stenberg campaigned on personal time for the "141 Rising" slate at O'Hare on either Saturday, June 2 or Sunday, June 3, 2012. Inasmuch as both Stenberg and Delaney were campaigning on their personal time, there was no violation of the LMRDA.

Allegation: Nelson alleged that on June 9 or June 10, 2012, Arthur Croker, Assistant General Chairperson for Hawaiian Airlines, visited the Phoenix Airport to campaign to Pacific Islander members employed by US Airways.

Response: The investigation established that Croker is responsible for representing DL 141 members who are employed by Hawaiian Airlines. While most DL 141 members who work for Hawaiian Airlines work in airports on the Hawaiian Islands, Hawaiian Airlines services cities on the mainland, including Phoenix. During the investigation, the person named by Nelson as having witnessed Croker campaign at the Phoenix Airport denied witnessing Croker campaign. Another member stated that he witnessed Croker campaigning at the Phoenix Airport on two occasions: around June 10, 2012 and approximately two weeks prior to that date. A review of Croker's Transportation Department Weekly travel report showed that Croker traveled from Hawaii to the Phoenix Airport once prior to the election, from June 8 to June 9, 2012.

19

Croker acknowledged that he traveled to Phoenix but denied campaigning for the "141 Rising" slate or distributing campaign literature at the Phoenix Airport. He contends that he traveled to Phoenix on union business to discuss a proposed Hawaiian Airlines employee attendance program, address a member's harassment claim against a manager, and answer members' questions about seniority and other issues. The investigation confirmed that Croker conducted union business while at the Phoenix Airport. The investigation did not reveal any evidence that Croker engaged in campaigning in the US Airways break room at Phoenix Airport that could not be considered incidental to union business. Campaigning incidental to regular union business would not be a violation of the LMRDA. 29 C.F.R. § 452.76. There was no violation of the LMRDA.

In relation to these specific instances of alleged improper campaigning, the Department examined the weekly travel report for DL 141 officers and compared the travel activity for a sample of the officers for the period January-February 2012 with their travel activity for the period May-June 2012. While that analysis revealed the officers in the sample spent on average 13.5 percent more days on union business travel during the latter period compared to the earlier period, such an increase in travel is not in and of itself a violation of the LMRDA. Some officers in the sample, including Delaney, spent fewer days traveling for union business during the May-June 2012 period. The investigation did not uncover any evidence that any of the DL 141 officers' union-paid travel prior to the election was for the purpose of campaigning for the "141 Rising" slate. There was no violation of the LMRDA.

Allegation 5: Nelson alleged that the "141 Rising" slate used union-issued mobile phones to campaign on Facebook during normal business hours which he defined as 9:00 a.m. to 5:00 p.m.

20

Response:  Section 401(g) of the LMRDA prohibits the use of union monies or resources to promote the candidacy of any person in an election subject to Title IV. 29 U.S.C. § 481(g); 29 C.F.R. § 452.73. The investigation revealed that all DL 141 officers are issued cellular phones that may be used for personal use. The investigation also revealed that DL 141 does not track officer or employee hours worked or lunch breaks. Nelson acknowledged that when he was employed by the DL 141 as an organizer between March 2009 and September 2011 he did not have a set work schedule and often worked weekends. Further, the investigation found that of the 12 Facebook posts that Nelson provided to support this allegation, only some of them were clearly partisan campaign posts, and none were posted on a weekday between 9:00 a.m. and 5:00 p.m. The investigation did not reveal sufficient evidence to establish whether any of the campaign Facebook postings may have been posted while a DL 141 officer or employee was working on union-paid time. There was no violation of the LMRDA.

Allegation 6:  Nelson alleged that the "141 Rising" slate used the union website, www.iam141.org, to link to a DL 141 Facebook page called *IAM Stakeholders*, which promoted the slate's election, and used the *IAM Stakeholders'* Facebook page for campaign purposes.

Response:  Section 401(g) of the LMRDA prohibits the use of union monies or resources to promote the candidacy of any person in an election subject to Title IV. 29 U.S.C. § 481(g); 29 C.F.R. § 452.73. The investigation revealed that since June 2011, DL 141 has maintained an open Facebook page named *IAM Stakeholders*. An open Facebook group is one where any Facebook user can view the group, who the group members are, and what members post. The investigation revealed that the DL 141 March 12, 2012 policy statement posted on the *IAM Stakeholders* Facebook page contained rules governing the site. The policy statement provides that certain topics and posts will be subject to removal, including those "dealing with

21

International, District, or Local union politics or elections." The policy statement also informs users that anyone "not respecting the scope of the discussions" will be subject to temporary suspension or permanent banning by the administrators. The investigation revealed that different types of posts were allowed on *IAM Stakeholders* as long as the established rules were followed.

The investigation established that Dave Lehive is the primary administrator for the Facebook page and is responsible for monitoring the site to ensure posts conform to the published rules which were posted at the top of the *IAM Stakeholders* page. The investigation found that Lehive monitored the site daily to ensure that no one violated the group page rules and tried to be as thorough as he could when reviewing posts and subsequent comments. Lehive deleted posts that violated the policy or he banned the group member responsible depending on the severity of the infraction. Group members also had the ability to delete their own posts that were in violation of the policy. Lehive acknowledged that despite his efforts he may have missed some posts that may have violated the established rules against posting campaign-related statements.

In investigating this allegation, the Department reviewed posts on *IAM Stakeholders* from June 1, 2012 through June 30, 2012. The investigation revealed that there were several instances in June 2012 in which Lehive posted reminders that the users should abide by the site rules and refrain from posting campaign statements. After this review, the Department concluded that Lehive effectively monitored *IAM Stakeholders* for improper campaign postings. Improper postings were not allowed to remain on the site. The investigation did not reveal any evidence that Lehive favored one candidate or slate over another in carrying out his responsibility as administrator of *IAM Stakeholders*. There was no violation of the LMRDA.

22

Allegation 7: Nelson alleged that Bartz used the DL 141 e-mail system to send a campaign e-mail regarding absentee ballots.

Response: Section 401(g) of the LMRDA prohibits the use of union monies or resources to promote the candidacy of any person in an election subject to Title IV. 29 U.S.C. § 401(g); 29 C.F.R. § 452.73. As a part of its investigation, the Department reviewed a copy of an e-mail sent Saturday, May 19, 2012 at 7:33 a.m. from the account Jbartz@iam141.org to recipient(s) whose names Nelson redacted. The review established that the content of the e-mail centered on the "141 Rising" slate's strategy to distribute and collect absentee ballot request cards that the slate had printed. The investigation found that e-mail recipients were asked to solicit members to complete absentee ballot request cards. It appeared from a review of this e-mail that the slate employed this strategy to do targeted mailings of the slate's campaign literature to members who were likely to vote an absentee ballot. Bartz denied sending this e-mail from his union e-mail account. To support his denial, Bartz demonstrated to the Election Supervisor how his personal Google e-mail account permitted him to select his JBartz@iam141.org e-mail address to use in the "From" field as an alternative to his jbartz141@gmail.com e-mail address.

The Department reviewed the sent items folder and trash folder of both Bartz's personal and the union's e-mail accounts and noted that the e-mail dated May 19, 2012, with a subject line "absentees" could not be found. While the investigation did not conclusively determine with certainty whether Bartz sent the May 19, 2012 e-mail from his personal Google e-mail account or from his DL 141 e-mail account, there was no evidence that he used a union computer, union e-mail contact list, or union time to transmit this campaign e-mail. It is noted that a follow-up campaign-related e-mail that Bartz sent on Sunday, May 20, 2012, at 5:13 p.m., was sent from

23

his personal Google e-mail account and none of the recipient email addresses had @iam141.org suffixes. There was no violation of the LMRDA.

Allegation 8: Nelson alleged that a political video ("EWR Meet and Greet") was improperly posted on the DL 141 website, www.iam141.org, in May 2012. He also alleged that Kevin Davis, a member of the union negotiations team, and a storekeeper at Houston Airport, explicitly says in the video, "I support Rich Delaney."

Response: The Department reviewed the video on You Tube, the internet-based video site. A review of the video revealed that the focus of the video was to update members on DL 141's negotiations with United Airlines. There were no remarks related to the DL 141 officer election that could be considered partisan campaign messages. Davis spoke for about one minute in the video and his statement "I support Rich Delaney" was spoken in the context of supporting Delaney, who was the chief union negotiator, during the ongoing negotiations with the employer. The Department concluded that neither the tone nor content of Davis's statement constituted partisan campaigning. There was no violation of the LMRDA.

Allegation 9: Nelson alleged that DL 141 officers covertly made copies of the absentee ballot applications that members had filled out, so that the "141 Rising" slate could target the absentee ballot applicants for campaigning. He cited Bartz's May 19, 2012 e-mail referenced above in Allegation 7 as evidence that the "141 Rising" slate was improperly obtaining absentee ballot applications from local lodges in order to send the slate's campaign literature to absentee ballot applicants.

Response: The investigation established that the DL 141 Bylaws do not prohibit candidates from soliciting members to request absentee ballots. The investigation found that the "141 Rising" slate purchased 9,300 absentee ballot request cards from the printer, Bell Litho,

24

Inc. A review of Bell Litho Inc. invoices confirmed that the "141 Rising" slate ordered and paid for 9,300 absentee ballot request cards. The investigation established that the "141 Rising" slate members and supporters circulated these cards to members as part of the slate's campaign strategy. The investigation found no evidence that the "141 Rising" slate supporters improperly accessed absentee ballot cards that members submitted directly to local lodges. Moreover, the investigation did not reveal any evidence that union funds or union time were used to facilitate the "141 Rising" slate's distribution and collection of slate absentee ballot cards. There was no violation of the LMRDA.

Allegation 10: Nelson alleged that US Airways harassed and intimidated opposition candidates and showed bias in favor of incumbents when the company permitted the incumbent officers to have access to US Airways work areas while denying opponents the same access. In particular, he identified Arthur Croker, who is based in Phoenix, Arizona as an example of a DL 141 officer being permitted to have access to US Airways facilities to campaign while denying similar access to opponents. Nelson cited instances at airports in Washington, D.C., Charlotte, North Carolina and Philadelphia, Pennsylvania.

Response: Section 401(c) of the LMRDA provides that adequate safeguards to insure a fair election shall be provided. Such safeguards are not required to be included in the union's constitution and bylaws, but they must be observed. Under the LMRDA, there must be equal opportunity for all candidates to campaign. 29 U.S.C. § 481(c); 29 C.F.R. § 452.110(a). US Airways is permitted to place restrictions on campaigning on employer property so long as the restrictions are consistently and indiscriminately enforced and do not favor any candidate or slate of candidates. 29 C.F.R. § 452.79. The investigation, which included an interview with the Managing Director of Labor Relations for US Airways, established that union members

25

employed by US Airways could campaign in break rooms during non-work hours on a one-on-one basis, but no scheduled meetings or speeches to large groups were allowed. The investigation further revealed that any members of DL 141 who were not employed by US Airways or who were employed by US Airways at another location were not permitted to access the non-work US Airways areas at other airports for the purpose of campaigning.

The investigation revealed that at the time of the election, Nelson was employed by US Airways as a ramp employee/baggage handler at O'Hare. As such, and in accordance with US Airways' policy regarding union members campaigning on US Airways work areas at airports, his access to the US Airways work areas in Phoenix and Washington, D.C. was restricted. The investigation concluded that US Airways management did not act improperly by restricting Nelson's access to the US Airways break rooms in Washington, D.C. and Phoenix.

Nelson identified Bill Kleine, a member of his slate, as another candidate who was informed by a US Airways senior manager at the Charlotte airport that he could not campaign in the US Airways work areas. The investigation revealed that Kleine was asked to stop campaigning, but he was later given permission to campaign while on personal time. Kleine was able to successfully campaign in the catering work area on two occasions and campaigned in five or six other break rooms without interference. The investigation also revealed that all candidates who were based in Charlotte campaigned regularly in the US Airways' break rooms. With regard to the allegation that Croker was permitted to campaign to members employed by US Airways, the investigation of this allegation, as discussed and addressed above in Nelson's post-election protest, allegation 4, did not reveal any evidence that Croker engaged in campaigning that could not be considered incidental to union business.

26

Nelson also alleged that "Occupy 141" slate members were told to leave US Airways work areas at Phoenix Airport after campaigning in a break room. The investigation, which included an interview with a Senior Manager of US Airways Fleet Services, revealed that prior to the election, a duty manager at Phoenix escorted employees from another airline or duty station from the US Airways facility because the members were campaigning. The investigation revealed that the Senior Manager of US Airways at Phoenix permitted Michael Maiorino, a newly appointed assistant general chairperson, to visit the facility to introduce himself to the members, but he was not permitted to campaign. The investigation further revealed that the US Airways Fleet Services senior manager was not aware of any incident where a US Airways manager allowed a candidate for District DL 141 to campaign to members while preventing other members from doing the same. The investigation revealed no evidence that US Airways management treated any candidate or slate of candidates differently with regard to allowing access to its facilities for campaign purposes. There was no violation of the LMRDA.

Allegation 11: Nelson alleged that two Local Lodge 1782 members who requested absentee ballots received incorrect ballots. He asserted that Sally Bowman and Tommy Bowman received absentee ballots for the DL 141 delegate nomination and not the DL 141 officer election.

Response: The investigation revealed that Local Lodge 1782 had two different absentee ballot forms in circulation at the time of the June 2012 DL 141 officer election. The Bowmans initially submitted absentee ballot requests for the DL 141 delegate nominations and later submitted absentee ballot requests for the DL 141 officer election. The Department's examination of the Local Lodge 1782 voter eligibility list for the DL 141 officer election revealed that both Sally Bowman and Tommy Bowman voted by absentee ballot and that their

27

voted ballots were included in the tally for the June 2012 officer election. There was no violation of the LMRDA.

Allegation 12: Nelson alleged that Local Lodge 1351's absentee ballots were returned undeliverable because the officers had the wrong return address on the absentee ballot return envelopes. This issue was raised verbally with the Election Supervisor during the pre-election period.

Response: In response to the error in the mailing address preprinted on the absentee ballot return envelope, the Election Supervisor directed Local Lodge 1351 to mail a second round of absentee ballots. All Local Lodge 1351 members who requested an absentee ballot were mailed a second complete mail ballot package to remedy this problem. Also, the deadline for receiving voted absentee ballots from Local Lodge 1351 members was extended past the original tally date to ensure that members had a reasonable time period to return voted ballots. As a result of this corrective action, no Local Lodge 1351 members were denied their right to vote by absentee ballot. There was no violation of the LMRDA.

Allegation 13: Nelson alleged that Tony D'Aloiso, Director of Safety for IAM at US Airways, campaigned for Delaney at the Phoenix Airport on union paid-time under the guise of holding a safety meeting.

Response: A review of D'Aloiso's Transportation Weekly Travel Report revealed that he attended a meeting of Local Lodge 2559 safety representatives at the Phoenix Airport on May 16, 2012. The investigation revealed that D'Aloiso opened his talk by stating "Delaney sends his best to the members. He makes it possible for me to do safety work." While the investigation revealed that only two members who attended the meeting stated that D'Aloiso urged the attendees to vote for the current officers, D'Aloiso denied campaigning or passing out

28

campaign literature. Campaigning incidental to regular union business would not be a violation

of the LMRDA. 29 C.F.R . § 452.76. The investigation did not reveal any evidence that

D'Aloiso engaged in campaigning at Phoenix on May 16, 2012, that could not be considered

incidental to union business. There was no violation of the LMRDA.

Nelson also included several allegations in his post-election protest that, even if true, would

not be violations of Title IV of the LMRDA. For that reason, the following allegations were not

investigated:

- Nelson alleged that current officers were unfair to the opponents and disregarded election and nomination processes that were agreed to by DL 141 and the Department of Labor when they made comments about challenging candidates and their qualifications for office.

- Nelson alleged that the Secretary-Treasurer Atkinson lied to the membership after the polls closed at Local Lodge 1487 on Tuesday, June 5, 2012, by announcing on Facebook that "141 Rising" had won O'Hare when he knew full well that the tally had yet to be started. Nelson alleged that such comments were intentional with a motive to influence the voters on the second day of voting with fabricated voting results of the first day.

- Nelson alleged Occupy 141 candidate Anthony Belsanti was removed from his shop steward position and that Occupy 141 candidate Dave Kraaz was asked to remove his shop steward badge because he posted political statements against Delaney on Facebook.

- Nelson alleged that the '141 Rising' slate used a magnetic sign that said "Local Lodge" to give the appearance that van rides on election day were from the local lodge and would be unbiased.

- Nelson alleged that Local Lodge 1759, Dulles Airport (IAD), spoiled the absentee ballots for all the US Airways members by including a "District Officer nomination form" when the official absentee ballots were mailed to them. Nelson, however, told the Department's Election Supervisor that IAD absentee ballots packages contained the correct officer ballot. Nelson further stated he was unaware if any members did not vote because they were confused by the contents of the absentee ballot packages.

- Nelson alleged that George Allott, candidate for assistant general chairperson, was disciplined by his employer, US Airways, for a work related incident that occurred on June 27, 2012 at the Phoenix Airport. Nelson contends that Allott was unfairly disciplined because he was a candidate for an officer position with DL 141.

The Department has concluded from its investigation and analysis that the violations of Title IV of the LMRDA that occurred during the June 2012 supervised election could not have affected the outcome of the election or have been remedied. Accordingly, the election held pursuant thereto complied with the District Court's Order and the results of the supervised election are certified.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 26th day of March, 2013, in the City of Washington, District of Columbia.

Patricia Fox
Chief, Division of Enforcement
Office of Labor-Management Standards
United States Department of Labor
Washington, D. C. 202